**FITZGERALD JOSEPH LLP**
JACK FITZGERALD (SBN 257370)
*jack@fitzgeraldjoseph.com*
PAUL K. JOSEPH (SBN 287057)
*paul@fitzgeraldjoseph.com*
MELANIE PERSINGER (SBN 275423)
*melanie@fitzgeraldjoseph.com*
TREVOR M. FLYNN (SBN 253362)
*trevor@fitzgeraldjoseph.com*
CAROLINE S. EMHARDT (SBN 321222)
*caroline@fitzgeraldjoseph.com*
2341 Jefferson Street, Suite 200
San Diego, California 92110
Phone: (619) 215-1741
***Counsel for Plaintiff***

## UNITED STATES DISTRICT COURT
## SOUTHERN DISTRICT OF CALIFORNIA

REBECCA LEE, on behalf of herself, all others similarly situated, and the general public,

Plaintiff,

v.

NATURE'S PATH FOODS, INC.,

Defendant.

Case No: **'23CV0751 H    MSB**

CLASS ACTION

**COMPLAINT FOR VIOLATIONS OF CAL. BUS. & PROF. CODE §§17200 *et seq*.; CAL. BUS. & PROF. CODE §§17500 *et seq*.; and CAL. CIV. CODE §§ 1750 *et seq*.; BREACH OF EXPRESS & IMPLIED WARRANTIES; NEGLIGENT AND INTENTIONAL MISREPRESENTATION; AND UNJUST ENRICHMENT**

DEMAND FOR JURY TRIAL

Plaintiff Rebecca Lee, on behalf of herself, all others similarly situated, and the general public, by and through her undersigned counsel, brings this action against Nature's Path Foods, Inc. ("Nature's Path"), and alleges the following upon her own knowledge, or where she lacks personal knowledge, upon information and belief, including the investigation of her counsel.

## INTRODUCTION

1.     Nature's Path sells granola cereals (the "Products") whose packaging claims their consumption comprises a "wholesome breakfast to nourish your day," and will "put you on a better path to a healthier lifestyle." Those representations, however, are false and misleading because the Products are high in added sugar, the excessive consumption of which harms bodily health.

2.     Scientific evidence demonstrates that consuming high levels of added sugar, like that found in the Products, increases the risk of, *inter alia*, cardiovascular heart disease, type 2 diabetes, metabolic disease, and liver disease.

3.     Because the Products are not healthy, Plaintiff brings this action on behalf of herself, similarly-situated Class Members, and the general public, to enjoin Nature's Path from deceptively marketing the Products in this manner and to recover compensation for injured Class Members.

## JURISDICTION & VENUE

4.     This Court has original jurisdiction over this action under 28 U.S.C. § 1332(d)(2) (The Class Action Fairness Act) because the matter in controversy exceeds the sum or value of $5,000,000, exclusive of interest and costs, and at least one member of the class of plaintiffs is a citizen of a state different from Nature's Path. In addition, more than two-thirds of the members of the class reside in states other than the state in which Nature's Path is a citizen and in which this case is filed, and therefore any exceptions to jurisdiction under 28 U.S.C. § 1332(d) do not apply.

5.     The Court has personal jurisdiction over Nature's Path because it has purposely availed itself of the benefits and privileges of conducting business activities within California, including by distributing and selling the Nature's Path Granola in California.

6.     Venue is proper in this Southern District of California pursuant to 28 U.S.C. § 1391(b) and (c), because Defendant resides (*i.e.*, is subject to personal jurisdiction) in this district, and because a substantial part of the events or omissions giving rise to the claims occurred in this district.

## PARTIES

7.     Plaintiff Rebecca Lee presently resides and intends to continue to reside in San Diego County, California. Accordingly, she is a citizen of the State of California.

8.     Defendant Nature's Path Foods, Inc. is incorporated in Washington state and has its principal place of business in Blaine, Washington. Accordingly, it is a citizen of the state of Washington.

## FACTS

## I.     NATURE'S PATH MARKETS GRANOLA PRODUCTS AS HEALTHY

9.     Consumers prefer healthy foods and are willing to pay more for, and purchase more often, products marketed and labeled as being healthy.[1]

10.     During at least the four years preceding the filing of this Complaint and continuing today, Nature's Path has sold the Products on a nationwide basis, including in California.

11.     The Products' packaging says it is "a wholesome [organic] breakfast to nourish your day" and "[it']ll put you on a better path to a healthier lifestyle."

---

[1] *See*, *e.g.*, Nancy Gagliardi, "Consumers Want Healthy Foods—And Will Pay More For Them," *Forbes* (Feb. 18, 2015) ("88% of those polled are willing to pay more for healthier foods").

*Lee v. Nature's Path Foods, Inc.*
CLASS ACTION COMPLAINT

12.    An image of the "Coconut Chia" flavor of the Products appears below.[2]



13.    Food companies with marketing departments, like Nature's Path, know that nutrition science is complex and that most consumers resort to making inferences to fill in

---

[2] During the relevant time period, the Products were sold in at least five flavors: Pumpkin Seed + Flax, Vanilla Almond + Flax, Peanut Butter, Coconut Chia, and Hemp Hearts. They have also been sold in at least the following sizes: 350g, 750g, and 1000g. This Complaint, however, should be read to include any additional sizes and flavors not yet identified. *See* Appendix 1 (providing exemplars of labeling).

the gaps in their knowledge. Nature's Path also knows that the inferences consumers make will be consistent with the statements and images that are presented on a label.[3]

14.   Nature's Path conveys this health message through the use of the words "wholesome," "nourish," and "healthier" in the challenged phrases.

15.   In several cases, Nature's Path further bolsters the "healthy" message by highlighting the more healthful ingredients in the Products, while ignoring or downplaying their added sugars. These statements include, for the various flavors:

| Flavor | Bolstering Phrases |
| --- | --- |
| Coconut Chia | • "Fiber-rich coconut flakes"<br>• "nutrient-dense coconut and fiber-rich chia seeds" |
| Pumpkin Seed + Flax | • "ALA Omega-3-rich flax seeds"<br>• "Pumpkin seeds for added . . . nutrition"<br>• "a sprinkle of . . . sweetness" |
| Vanilla Almond + Flax | • "ALA Omega-3-rich flax seeds"<br>• "nutrient-dense almonds and flax seeds" |
| Hemp Hearts | • "ALA Omega-3-rich flax seeds"<br>• "Fiber-dense hemp hearts"<br>• "nutrient-dense hemp and flax seeds"<br>• "a touch of sweetness" |

16.   This health and wellness messaging for the Products is false and misleading because the Products' added sugar, between 7g and 9g per serving, contributes between 10% to 14% of their calories.

17.   Moreover, people tend to overeat granola. A Consumer Reports' food testing team asked 124 consumers to pour their "typical" amounts of a low-density cereal (Cheerios),

---

[3] *See*, *e.g.*, Chandon, Pierre, "How Package Design and Packaged-based Marketing Claims Lead to Overeating," *Applied Economic Perspective and Policy*, Vol. 35 (2012).

medium-density cereal (Quaker Oatmeal Squares), and high-density granola (Quaker Simply Oats, Honey, Raisins & Almonds), ninety-two percent of participants poured more than the recommended serving size of all the cereal types.[4] "The denser the cereal, the more the participants exceeded the serving size. For granola, the average 'overpour' was 282 percent. A serving that big means consuming two to four times the calories, fat and sugars listed on the Nutrition Facts label."[5]

18.   Contrary to Nature's Path's health and wellness messaging for the Products, the scientific evidence demonstrates that consuming that amount of added sugar is decidedly *not* healthy.

## II.   CONSUMING ADDED SUGAR IS DETRIMENTAL TO HEALTH

### A.   Added Sugar Consumption Increases Risk of Cardiovascular Heart Disease and Mortality

19.   Cardiovascular diseases affect nearly half of American adults.[6]

20.   Cardiovascular Heard Disease (CHD) is the leading cause of death for men, women, and people of most racial and ethnic groups in the United States.[7] Approximately 20 million adults in the United States age 20 and older have coronary artery disease (CAD),

---

[4] Wadyka, Sally, "Is Granola Good for You?" *Consumer Reports* (Feb. 22, 2019), *available at* https://www.consumerreports.org/granola/is-granola-good-for-you.

[5] *Id.*

[6] American Heart Association News, "Cardiovascular diseases affect nearly half of American adults, statistics show" (Jan. 31, 2019), *available at* https://www.heart.org/en/news/2019/01/31/cardiovascular-diseases-affect-nearly-half-of-american-adults-statistics-show.

[7] Centers for Disease Controls and Prevention, "Heart Disease Facts," (last view February 3, 2023) (*available online at* https://www.cdc.gov/heartdisease/facts.htm).

which is the most common type of CHD.[8] In 2020, CAD killed more than 380,000 people.[9] Every year, more than 800,000 people in the United States have a heart attack.[10]

21.    Data obtained from National Health and Nutrition Examination surveys (NHANES) demonstrate that adults who consumed 10% - 24.9% of their calories from added sugar had a 30% greater risk of cardiovascular disease (CVD) mortality than those who consumed 5% or less of their calories from added sugar. In addition, those who consumed 25% or more of their calories from added sugar had an average 275% greater risk of CVD mortality than those who consumed less than 5% of calories from added sugar. Thus, "[t]he risk of CVD mortality increased exponentially with increasing usual percentage of calories from added sugar[.]"[11]



Figure 1. Adjusted Hazard Ratio (HR) of the Usual Percentage of Calories From Added Sugar for Cardiovascular Disease Mortality Among US Adults 20 Years or Older: National Health and Nutrition Examination Survey Linked Mortality Files, 1988-2006

Histogram of the distribution of usual percentage of calories from added sugar in the population. Lines show the adjusted HRs from Cox models. Midvalue of quintile 1 (7.4%) was the reference standard. The model was adjusted for age, sex, race/ethnicity, educational attainment, smoking status, alcohol consumption, physical activity level, family history of cardiovascular disease, antihypertensive medication use, Healthy Eating Index score, body mass index, systolic blood pressure, total serum cholesterol, and total calories. Solid line indicates point estimates; dashed lines indicate 95% CIs.

---

[8] *Id.*

[9] *Id.*

[10] *Id.*

[11] Yang, Quanhe, et al., "Added Sugar Intake and Cardiovascular Diseases Mortality Among US Adults," *JAMA*, at E4-5 (pub. online, Feb. 3, 2014).

*Lee v. Nature's Path Foods, Inc.*
CLASS ACTION COMPLAINT

22.     In a study of preschool children published in January 2020, researchers found that higher consumption of added sugar was significantly associated with elevated CMR (cardiometabolic risk) scores. The researchers stated that their "findings support recommendations to limit overall intake of SCB in early childhood, in [an] effort to reduce the potential long-term burden of CMR."[12]

23.     In another prospective cohort study, consumption of added sugar was significantly shown to increase risk of CHD, as well as adverse changes in some blood lipids, inflammatory factors, and leptin.[13]

24.     Added sugar consumption is also associated with several CHD risk factors, for example, dyslipidemia,[14] obesity,[15] and increased blood pressure.[16]

---

[12] Eny, KM, et al., "Sugar-containing beverage consumption and cardiometabolic risk in preschool children." *Prev. Med. Reports* 17 (Jan. 14, 2020).

[13] Koning, L.D., et al., "Sweetened Beverage Consumption, Incident Coronary Heart Disease, and Biomarkers of Risk in Men." *Circulation*, Vol. 125, pp. 1735-41 (2012).

[14] Elliott S.S., et al., "Fructose, weight gain, and the insulin resistance syndrome." *Am. J. Clin. Nutr.*, Vol. 76, No. 5, pp. 911-22 (2002).

[15] Faith, M.S., et al., "Fruit Juice Intake Predicts Increased Adiposity Gain in Children From Low-Income Families: Weight Status-by-Environment Interaction." *Pediatrics*, Vol. 118 (2006) ("Among children who were initially either at risk for overweight or overweight, increased fruit juice intake was associated with excess adiposity gain, whereas parental offerings of whole fruits were associated with reduced adiposity gain."); Schulze, M.B, et al., "Sugar-Sweetened Beverages, Weight Gain, and Incidence of Type 2 Diabetes in Young and Middle-Aged Women." *JAMA*, Vol. 292, No. 8, pp. 927-34 (2004) [hereinafter "Schulze, Diabetes in Young & Middle-Aged Women"]; Ludwig, D.S., et al., "Relation between consumption of sugar-sweetened drinks and childhood obesity: a prospective, observational analysis." *Lancet*, Vol. 257, pp. 505-508 (2001); Dennison, B.A., et al., "Excess fruit juice consumption by preschool-aged children is associated with short stature and obesity." *Pediatrics*, Vol. 99, pp. 15-22 (1997).

[16] Hoare, E., et al., "Sugar- and Intense-Sweetened Drinks in Australia: A Systematic Review on Cardiometabolic Risk." *Nutrients*, Vol. 9, No. 10 (2017).

**B.      Added Sugar Consumption Results in Increased Risk of Type 2 Diabetes**

25.    Diabetes affects 37.3 million Americans (approximately 1 in 10); 96 million American adults (more than 1 in 3) have prediabetes.[17] It can cause kidney failure, lower-limb amputation, and blindness. In addition, diabetes doubles the risk of colon and pancreatic cancers and is strongly associated with coronary artery disease and Alzheimer's disease.[18]

26.    Globally, countries where sugar consumption is highest have the highest rates of type 2 diabetes, while those with the lowest consumption have the lowest rates.[19] An econometric analysis of repeated cross-sectional data published in 2013, for example, established a causal relationship between sugar availability and type 2 diabetes. After adjusting for a wide range of confounding factors, researchers found that an increase of 150 calories per day related to an insignificant 0.1% rise in diabetes prevalence by country, while an increase of 150 calories per day in sugar related to a 1.1% rise in diabetes prevalence by country, a statistically significant 11-fold difference.[20]

27.    An analysis of data for more than 50,000 women from the Nurses' Health Study,[21] during two 4-year periods (1991-1995 and 1995-1999), showed, after adjusting for

---

[17] *See* https://www.cdc.gov/diabetes/library/spotlights/diabetes-facts-stats.html.

[18] Aranceta Bartrina, J. et al., "Association between sucrose intake and cancer: a review of the evidence," *Nutrición Hospitalaria*, Vol. 28 (Suppl. 4), 95-105 (2013); Garcia-Jimenez, C., "A new link between diabetes and cancer: enhanced WNT/beta-catenin signaling by high glucose," *Journal of Molecular Endocrinology*, Vol. 52, No. 1 (2014); Linden, G.J., "All-cause mortality and periodontitis in 60-70-year-old men: a prospective cohort study," *J. Clin. Periodontal*, Vol. 39, No. 1, 940-46 (Oct. 2012).

[19] Weeratunga, et al., "Per capita sugar consumption and prevalence of diabetes mellitus--global and regional associations," BMC Public Health, 2014 (February 20, 2014).

[20] Basu, S., et al., "The Relationship of Sugar to Population-Level Diabetes Prevelance: An Econometric Analysis of Repeated Cross-Sectional Data," *PLOS Online*, Vol. 8, Issue 2 (Feb. 27, 2013).

[21] The Nurses' Health Study was established at Harvard in 1976, and the Nurses' Health Study II, in 1989. Both are long-term epidemiological studies conducted on women's health.

confounding factors, that women who consumed 1 or more sugar-sweetened soft drink per day—equivalent to 140-150 calories and 35-37.5 grams of added sugar—had an 83% greater relative risk of type 2 diabetes compared with those who consumed less than 1 such beverage per month.[22]

28.     The link between sugar intake and diabetes still holds even after controlling for total calorie intake, body weight, alcohol consumption and exercise.[23]

29.     Most convincingly, an econometric analysis of repeated cross-sectional data published in 2013 established a causal relationship between sugar availability and type 2 diabetes. After adjusting for a wide range of confounding factors, researchers found that an increase of 150 calories per day related to an insignificant 0.1% rise in diabetes prevalence by country, while an increase of 150 calories per day in sugar related to a 1.1% rise in diabetes prevalence by country, a statically-significant 11-fold difference.[24]

## C.     Added Sugar Consumption Increases Risk of Metabolic Disease

30.     Metabolic syndrome is a group of conditions that together raise the risk of type 2 diabetes, cardiovascular disease, obesity, polycystic ovary syndrome, nonalcoholic fatty liver disease, and chronic kidney disease, and is defined as the presence of any three of the following:

   a.     Large waist size (35" or more for women, 40" or more for men);

---

The study followed 121,700 female registered nurses since 1976, and 116,000 female nurses since 1989, to assess risk factors for cancer, diabetes, and cardiovascular disease. The Nurses' Health Studies are among the largest investigations into risk factors for major chronic disease in women ever conducted. *See generally* "The Nurses' Health Study," *at* http://www.channing.harvard.edu/nhs.

[22] Schulze, M.B., et al., "Sugar-Sweetened Beverages, Weight Gain, and Incidence of Type 2 Diabetes in Young and Middle-Aged Women," *JAMA*, Vol. 292, No. 8, 927-34 (Aug. 25, 2004) [hereinafter "Schulze, Diabetes in Young & Middle-Aged Women"].

[23] Basu, S., et al., "The Relationship of Sugar to Population-Level Diabetes Prevelance: An Econometric Analysis of Repeated Cross-Sectional Data," *supra,* n. 23.

[24] *Id.*

b. High triglycerides (150mg/dL or higher, or use of cholesterol medication);

c. High total cholesterol, or HDL levels under 50mg/dL for women, and 40 mg for men;

d. High blood pressure (135/85 mm or higher); or

e. High blood sugar (100mg/dL or higher).

31. More generally, "metabolic abnormalities that are typical of the so-called metabolic syndrome . . . includ[e] insulin resistance, impaired glucose tolerance, high concentrations of circulating triacylglycerols, low concentrations of HDLs, and high concentrations of small, dense LDLs."[25]

32. About 1 in 3 adults in the United States have metabolic syndrome, placing them at higher risk for chronic disease.[26]

33. Defining "metabolic health" as having optimal levels of waist circumference (WC <102/88 cm for men/women), glucose (fasting glucose <100 mg/dL and hemoglobin A1c <5.7%), blood pressure (systolic <120 and diastolic <80 mmHg), triglycerides (<150 mg/dL), and high-density lipoprotein cholesterol (≥40/50 mg/dL for men/women), and not taking any related medication, data from the NHANES Survey 2009–2016 showed prevalence of "metabolic health" in American adults is alarmingly low, even in normal weight individuals.[27]

34. Excess consumption of added sugar leads to metabolic syndrome by stressing and damaging crucial organs, including the pancreas and liver. When the pancreas, which produces insulin, becomes overworked, it can fail to regulate blood sugar properly. Large

---

[25] Fried, S.K., "Sugars, hypertriglyceridemia, and cardiovascular disease," *Am. J. Clin. Nutr.*, Vol. 78 (suppl.), 873S-80S, at 873S (2003) [hereinafter, "Fried, Hypertriglyceridemia"].

[26] *See* https://www.nhlbi.nih.gov/health/metabolic-syndrome (last updated May 18, 2022).

[27] Araujo et al., "Prevalence of Optimal Metabolic Health in American Adults: National Health and Nutrition Examination Survey 2009-2016," *Metabolic Syndrome Related Disorders* (2019).

doses of added sugar can overwhelm the liver, which metabolizes the fructose in the sugar. In the process, the liver will convert excess fructose to fat, which is stored in the liver and released into the bloodstream. This process contributes to key elements of metabolic syndrome, including high blood fats and triglycerides, high cholesterol, high blood pressure, and extra body fat, especially in the belly.[28]

35.     In 2016, researchers conducted a study to determine whether the detrimental effects of dietary sugar were due to extremely high dosing, excess calories, or because of its effects on weight gain, rather than caused by sugar consumption directly.[29] In other words, the researchers dissociated the metabolic effects of dietary sugar from its calories and effects on weight gain.

36.     Because the researchers did not want to *give* subjects sugar to see if they got sick, they instead took sugar away from people who were already sick to see if they got well. But if subjects lost weight, critics would argue that the drop in calories or weight loss was the reason for the clinical improvement. Therefore, the researchers designed the study to be isocaloric, by giving back to subjects the same number of calories in starch that were taken away in sugar. The study involved 43 children, ages 8 to 19, each obese with at least one other co-morbidity demonstrating metabolic problems. All were high consumers of added sugar in their diets.[30]

37.     To perform the study, researchers assessed subjects' home diets by two questionnaires to determine how many calories, and how much fat, protein, and carbohydrate they were eating. Subjects were then tested at a hospital based on their home diets. Then, for

---

[28] Te Morenga, L., et al., "Dietary sugars and body weight: systematic review and meta-analyses of randomized controlled trials and cohort studies," *BJM* (January 2013) [hereinafter, "Te Morenga, Dietary Sugars & Body Weight"].

[29] Robert H. Lustig, et al., "Isocaloric Fructose Restriction and Metabolic Improvement in Children with Obesity and Metabolic Syndrome," *Pediatric Obesity*, Vol. 24, No. 2, 453-60 (Feb. 2016).

[30] *See id.* at 453-54.

*Lee v. Nature's Path Foods, Inc.*
Class Action Complaint

the next 9 days, researchers catered the subjects' meals. The macronutrient percentages of fat, protein, and carbohydrate were not changed. Subjects were fed them the same calories and percent of each macronutrient as their home diet; but within the carbohydrate fraction, researchers took the added sugar out, and substituted starch. For example, researchers took pastries out, and put bagels in; took yogurt out, and put baked potato chips in; took chicken teriyaki out, and put turkey hot dogs in (although subjects were still given whole fruit). Researchers reduced subjects' dietary sugar consumption from 28% to 10% of calories. Researchers also gave subjects a scale to take home, and each day they would weigh themselves. If they were losing weight, they were instructed to eat more. The goal was for subjects to remain weight-stable over the 10 days of study. On the final day, subjects came back to the hospital for testing on their experimental low-added sugar diet. The study team analyzed the pre- and post-data in a blinded fashion so as not to introduce bias.[31]

38.     Researchers analyzed three types of data. First, diastolic blood pressure decreased by 5 points. Second, baseline blood levels of analytes associated with metabolic disease, such as lipids, liver function tests, and lactate (a measure of metabolic performance) all improved significantly. Third, fasting glucose decreased by 5 points. Glucose tolerance improved markedly, and fasting insulin levels fell by 50%. Each of these results was highly-statistically-significant.[32]

39.     In sum, the study indicated that subjects improved their metabolic status in just 10 days, even while eating processed food, by just removing added sugar and substituting starch. The metabolic improvement, moreover, was unrelated to changes in weight or body fat.

**D.     Added Sugar Consumption Results in Increased Risk of Liver Disease**

40.     Added sugar consumption causes serious liver disease, including non-alcoholic fatty liver disease (NAFLD), characterized by excess fat build-up in the liver. Five percent of

---

[31] *See id.* at 454-55.

[32] *See id.* at 455-56.

these cases develop into non-alcoholic steatohepatitis (NASH), scarring as the liver tries to heal its injuries, which gradually cuts off vital blood flow to the liver. About 25% of NASH patients progress to non-alcoholic liver cirrhosis, which requires a liver transplant or can lead to death.[33]

41.    Since 1980, the incidence of NAFLD and NASH has doubled, along with the rise of fructose consumption, with approximately 6 million Americans estimated to have progressed to NASH and 600,000 to Nash-related cirrhosis. Most people with NASH also have type 2 diabetes. NASH is now the third-leading reason for liver transplant in America.[34]

42.    Moreover, because the liver metabolizes sugar virtually identically to alcohol, the U.S. is now seeing for the first time alcohol-related diseases in children. Conservative estimates are that 31% of American adults, and 13% of American children suffer from NAFLD.[35]

**E.    Authoritative Bodies Recommend, for Good Health, Excluding or Minimizing Added Sugar Consumption**

43.    The 2020-2025 Dietary Guidelines for Americans ("2020 DGAs") state that a healthy dietary pattern limits added sugars to less than 10 percent of daily calories, adding

---

[33] Farrell, G.C., et al., "Nonalcoholic fatty liver disease: from steatosis to cirrhosis," *Hepatology*, Vol. 433, No. 2 (Suppl. 1), S99-S112 (February 2006); Powell, E.E., et al., "The Natural History of Nonalcoholic Steatohepatitis: A Follow-up Study of Forty-two Patients for Up to 21 Years," *Hepatology*, Vol. 11, No. 1 (1990).

[34] Charlton, M.R., et al., "Frequency and outcomes of liver transplantation for nonalcoholic steatohepatitis in the United States," *Gastroenterology*, Vol. 141, No. 4, 1249-53 (Oct. 2011).

[35] Lindback, S.M., et al., "Pediatric Nonalcoholic Fatty Liver Disease: A Comprehensive Review," *Advances Pediatrics*, Vol. 57, No. 1, 85-140 (2010); Lazo, M. et al., "The Epidemiology of Nonalcoholic Fatty Liver Disease: A Global Perspective," *Seminars Liver Dis.*, Vol. 28, No. 4, 339-50 (2008); Schwimmer, J.B., et al., "Prevalence of Fatty Liver in Children and Adolescents," *Pediatrics*, Vol. 118, No. 4, 1388-93 (2006); Browning, J.D., et al., "Prevalence of hepatic steatosis in an urban population in the United States: Impact of ethnicity," *Hepatology*, Vol. 40, No. 6, 1387-95 (2004).

that "[w]hen added sugars in foods and beverages exceed 10 percent of calories, a healthy dietary pattern within calories limits is very difficult to achieve."[36]

44.      The Scientific Report of the 2020 Dietary Guidelines Advisory Committee was even stricter than what the USDA and HHS ultimately adopted, "suggest[ing] that less than 6 percent of energy from added sugars is more consistent with a dietary pattern that is nutritionally adequate . . . than is a pattern with less than 10 percent energy from added sugars."[37]

45.      The World Health Organization (WHO) recommends that no more than 10% of an adult's calories, and ideally less than 5%, come from free or added sugar.[38]

46.      The American Heart Association recommends restricting added sugar to 5% of calories.[39] Based on the average caloric needs, this equates to 12 grams daily for children 4 to 8 years old, up to 25 grams for older children and women, and 38 grams for men. Thus, a single serving of the Nature's Path Granola, depending on the flavor (7g to 9g added sugar), contains 58-75% of the daily limit for children 4 to 8 years old, 28-36% of the daily limit for older children and adult women, and 18-23% of the daily limit for adult men.

---

[36] U.S. Dep't of Health & Human Servs. and U.S. Dept. of Agric., "Dietary Guidelines for Americans 2020 –2025," at 41 (8th ed.), *available at* https://www.dietaryguidelines.gov/sites/default/files/2020-12/Dietary_Guidelines_for_Americans_2020-2025.pdf [hereinafter "2020 DGA"].

[37] U.S. Department of Agriculture, "Scientific Report of the 2020 Dietary Guidelines Advisory Committee" (2020), Part A, p. 11.

[38] World Health Organization, "Healthy Diet," *available at* https://www.who.int/news-room/fact-sheets/detail/healthy-diet.

[39] Johnson, R.K., et al., on behalf of the American Heart Association Nutrition Committee of the Council on Nutrition, Physical Activity, and Metabolism and Council on Epidemiology and Prevention, "Dietary Sugars Intake and Cardiovascular Health: A Scientific Statement From the American Heart Association," *Circulation*, Vol. 120, 1011-20, at 1016-17 (2009).

47.     The Centers for Disease Control and Prevention warns that "[t]oo much sugar in your diet can lead to health problems such as weight gain and obesity, type 2 diabetes, and heart disease."[40]

48.     The Harvard School of Public Health points out that "the Healthy Eating Plate does not include foods with added sugars."[41]

## III.    THE PRODUCTS' HEALTH AND WELLNESS REPRESENTATIONS AND OMISSIONS ARE LIKELY TO MISLEAD REASONABLE CONSUMERS

### A.     Defendant's Health and Wellness Claims Leverage Consumer Confusion Regarding the Healthfulness of Granola

49.     Even though granola is usually considered a healthy breakfast cereal, "its nutritional profile varies widely depending on the specific ingredients used."[42] Accordingly, "the contribution of your bowl of granola to delivering [ ] nutritional and other health benefits will be dependent on the type and amounts of ingredients used."[43]

50.     In the words of Dariush Mozaffarian, dean of the Tufts Friedman School of Nutrition Science and Policy, "[o]nce you get beyond 'eat your veggies, avoid soda,' the public is pretty confused about how to identify healthier choices in the grocery store, cafeteria, and restaurant."[44]

---

[40] Centers for Disease Control and Prevention, Know Your Limit for Added Sugars, https://www.cdc.gov/healthyweight/healthy_eating/sugar.html.

[41] Harvard T.H. Chan School of Public Health, "Added Sugar," The Nutrition Source (2022), *available at* https://www.hsph.harvard.edu/nutritionsource/carbohydrates/added-sugar-in-the-diet.

[42] Mandl, Elise, "Is Granola Healthy? Benefits and Downsides," *Healthline* (Sept. 25, 2019) *available at* https://www.healthline.com/nutrition/is-granola-healthy.

[43] Shubrook, Nicola, "Is granola healthy?" *BBC* (March 2, 2022) *available at* https://www.bbcgoodfood.com/howto/guide/granola-healthy.

[44] Collins and LaPoint, "Ranking Healthfulness of Foods from First to Worst," *Tufts Now* (Oct. 14, 2021) *available at* https://now.tufts.edu/2021/10/14/ranking-healthfulness-foods-first-worst.

51.    Nature's Path's health and wellness representations for the Products challenged herein work in part because they leverage a misconception most consumers have that all granola is healthy.

52.    In a 2016 survey of 2,000 Americans and 672 professional nutritionists, 80% percent of Americans surveyed believed granola was healthy, while only 47% of nutritionists said the same.[45]

53.    In a related article titled "Americans Still Believe Granola is Good for Them," the author wrote, "[g]ranola . . . is still getting the better of the American masses" who, unlike nutritionists, consider it "to be a healthy thing to eat."[46] "What could be behind that divergence? Sugar, of course."[47]

54.    One month after publishing its article on the survey, New York Times published an article titled "Why Your Granola Is Really a Dessert," writing:

> In 1863, Dr. James Caleb Jackson, a staunch nutrition advocate, created the world's first recipe for what would become granola. The dish (he called it granula) consisted of dense, unsweetened bran nuggets, soaked in milk.
>
> But if Dr. Jackson were alive today, it's unlikely he would recognize the modern incarnation of his creation. Despite its reputation as a breakfast health food, granola has become nothing less than a sweet dessert.[48]

55.    At the time of the article, "[s]ales data suggest[ed] that the popularity of granola is at its peak, with Americans spending nearly $2 billion annually on granola products. In

---

[45] Quealy, K. and Sanger-Katz, M., "Is Sushi 'Healthy'? What About Granola? Americans and Nutritionists Disagree," *New York Times* (July 5, 2016) *available at* https://tinyurl.com/55brskmc.

[46] Evans, Dayna, "Americans Still Believe Granola is Good for Them," *The Cut* (July 5, 2016) *available at* https://www.thecut.com/2016/07/granola-is-bad-for-you.html.

[47] *Id.*

[48] O'Connor, Anahad, "Why Your Granola Is Really a Dessert," *New York Times* (Aug. 30, 2016), *available at* https://www.nytimes.com/2016/08/30/well/eat/why-your-granola-is-really-a-dessert.html.

2014, the market for private-label granola and related cereals in the United States exceeded $750 million, according to Statista, a market research firm."[49]

56.     In 2018, Time magazine published an article titled "Is granola healthy?" writing, "It absolutely can be. But products vary greatly, and knowing whether or not the nutty snack lives up to its nutritional claims can take a little bit of digging."[50]

57.     In 2019, Consumer Reports published an article titled "Is Granola Good for You?" writing, "Granola is one of those foods that comes with a giant health halo," and quoting Lauri Wright, Ph.D., chair of the department of nutrition and dietetics at the University of North Florida in Jacksonville, as saying "there are a lot of land mines when it comes to choosing granola," and "[y]ou have to be a very savvy consumer to find the healthiest one."[51]

58.     In 2020, Health Digest published an article titled "Granola Isn't As Healthy As You Think It Is. Here's Why," citing Consumer Reports testing demonstrating people overeat granola, and quoting registered dietitian Andy DeSantis as saying, "Granola is a food that we have been led to believe is quite good for us but could be a real problem food for those trying to manage their weight. Granola is, in most cases, simply oatmeal that has significant amounts of oil and sugar added such that it tastes amazing, but will cost you far more calories."[52]

59.     "One reason why people think of granola as 'healthy' is because it's traditionally been eaten by epically healthy people [such as] [h]ikers, runners, and other outdoor

---

[49] *Id.*

[50] Shortsleeve, Cassie, "Is Granola Healthy? Here's What Experts Say," *Time* (Oct. 29, 2018) *available at* https://time.com/5435934/is-granola-healthy/.

[51] Wadyka, *supra* n.4.

[52] Mark, Jorie, "Granola Isn't As Healthy As You Think It Is. Here's Why," *Health Digest* (July 27, 2020) *available at* https://www.healthdigest.com/230738/granola-isnt-as-healthy-as-you-think-it-is-heres-why/.

enthusiasts[.]"[53] But "[g]ranola is good for fueling a long workout—not your everyday morning hustle."[54]

## B. The Disclosure of Added Sugar in the Nutrition Facts Panel Does Not Correct the Misrepresentation

60. The disclosure of the gram amount of added sugar in the Products' Nutrition Facts Panels is insufficient to dispel Nature's Path's misleading health and wellness claims. Not only are reasonable consumers not expected to inspect that information, but numerous studies demonstrate most consumers cannot make accurate assessments of a food's healthfulness based on the Nutrition Facts Panel, even when they do review it.

61. Research shows most consumers do not actually review the sugar content of products, and even those who do are often unable to accurately determine a products' healthfulness. The University of Minnesota's Epidemiology Clinical Research Center simulated a grocery shopping exercise on a computer equipped with an eye-tracking camera and found that, even for the relatively small subset of consumers that claim to "almost always" look at a product's sugar content (24%), *only about 1% actually look beyond the calorie count to other components of the Nutrition Facts panel, such as sugar*.[55] Data from the survey suggests the average consumer reads only the top five lines on a Nutrition Facts label (serving size, calories, total fat, saturated fat, trans fat). Total and added sugar—listed twelfth and thirteenth—follows cholesterol, sodium, total carbohydrate, and dietary fiber, among other things.

62. A survey of more than one hundred college students examined how those with differing levels of nutrition knowledge "interpreted intrinsic cues (ingredient list) and

---

[53] *Id.*

[54] *Id.*

[55] Graham & Jeffery, "Location, location, location: Eye-tracking evidence that consumers preferentially view prominently positioned nutrition information," *J. Am. Diet. Assoc.* (2011) (emphasis added).

extrinsic cues," such as an "all natural" labeling claim.[56]  The survey found that while those who had completed an upper-division nutrition course "used central route processing to scrutinize intrinsic cues and make judgments about food products," those that had not completed an upper-division nutrition course "did the opposite," relying on extrinsic cues.[57] The average consumer will thus more likely rely on labeling claims than the ingredient list or Nutrition Facts Box, to make a judgment about whether a food is healthy.

63.     Moreover, "mandated nutrition labels have been criticized for being too complex for many consumers to understand and use."[58] "Using NFP labels requires not only being able to read and perform arithmetic but also — just as importantly — the ability to reason with words and numbers. According[ly], a substantial proportion of consumers clearly struggle to effectively use the information contained in a nutrition label."[59]

64.     One survey found "[s]ubjects were not very good at using the [nutrition] label to make mathematical calculations, evaluate false claims, or draw dietary implications about a product," and "[r]esearch has consistently found that consumers have difficulty using label information if the task requires math."[60]  Accordingly, the authors concluded the nutrition label is "an inadequate tool for helping people to plan diets" and "unlikely to contribute by

---

[56] Walters, Amber, et al., "The effect of food label cues on perceptions of quality and purchase intentions among high-involvement consumers with varying levels of nutrition knowledge," *J. Nutr. Educ. Behav*. 44(4): 350-54 (2012).

[57] *Id.*

[58] Persoskie A, Hennessy E, Nelson WL, "US Consumers' Understanding of Nutrition Labels in 2013: The Importance of Health Literacy," *Prev. Chronic Dis*. 14;170066 (2017) [hereinafter "Persoskie, US Consumers' Understanding"].

[59] *Id*. ("Some studies have found that even high school graduates and college students lack the basic health literacy skills to effectively apply nutrition label information[ ].").

[60] Levy & Fein, "Consumers' ability to perform tasks using nutrition labels," *J. Nutr. Educ. & Behav.* (1998).

itself to a better or more critical understanding of nutrition principles."[61] In sum, the "mathematical skills of the American population present a significant barrier to following dietary recommendations based on quantitative tasks."[62]

65.    Consumers' inability to effectively use the nutrition label is particularly problematic in light of their tendency to rely heavily on symbolic cues of healthfulness. For example, in a survey of 164 consumers, participants were asked to evaluate the healthiness of two breakfast cereals based on the information provided in a nutrition table. For one group, "the label 'fruit sugar' was used; for the other, the label 'sugar' was used. Results suggest[ed] that the phrase 'fruit sugar' listed as an ingredient of the breakfast cereal resulted in a more positive perception of the healthiness of the cereal compared with the ingredient labeled 'sugar.'"[63]

66.    A recent survey of 2,000 U.S. participants demonstrated that "[t]he American population fails very clearly to identify healthy products . . . ."[64] In the survey, each participant was shown a collection of cereal bars and asked to rank them from healthiest to

---

[61] *Id.*

[62] *Id.*

[63] Sutterlin, Bernadette, et al., "Simply adding the word 'fruit' makes sugar healthier: The misleading effect of symbolic information on the perceived healthiness of food," *Appetite* (July 2015) ("The labeling of the ingredients by making use of symbolic information may, consequently, exert a misleading effect on a consumer's assessment of the product's healthiness. The findings suggest that the effect is quite robust. A more profound and comprehensive evaluation of the provided information (as occurs with people with pronounced health consciousness) does not protect against the misleading effect of symbolic information and does not add to judgment accuracy. This indicates that relying and drawing on the symbolic meaning of information is, to a certain extent, an automatic and implicit process that cannot easily be corrected by increasing people's health consciousness.").

[64] Shaheen, Mansur, "Only 9% of Americans can properly read a nutrition label with many falling for misleading labels like 'whole grain' or 'fat free' on the front of packaging," Daily Mail (Apr. 15, 2022) [hereinafter "Shaheen, nutrition label"], *available at* https://www.dailymail.co.uk/health/article-10722517/Only-9-Americans-properly-read-nutrition-label.html?ns_mchannel=rss&ns_campaign=1490&ito=1490.

least healthy. The products' health "rankings were based off of the A through E Nutri-score used to grade some food products in the UK," and ultimately, "only 9% of participants were able to correctly identify which product was the healthiest[.]"[65]

67.     "Even more worrying, 13 percent identified the least nutritious food option as the healthiest—more than the amount who properly identified the healthiest."[66] This was despite that "60% actively are seeking food and beverage products to support their overall health," demonstrating "widespread confusion when it comes to determining what is and isn't healthy." [67]

68.     Thus, although "Americans are often advised to eat healthier, more nutritious foods in an effort to stifle the diabetes and the obesity epidemic striking the nation[,] [r]esearchers find that many cannot identify healthy foods in the grocery store aisle . . . ."[68] Instead, Americans were found to misidentify claims such as "whole grain" or "naturally flavored" as "markers that a food [is] healthy." These claims, however, often "mislead people on what products are actually healthy for them," and "Americans failure to identify healthy products is likely playing a role in the nation's budding obesity and diabetes epidemics."[69]

69.     The survey also looked at the impact of "call[ing] out the amount of different nutrients in their products . . . on the front of their packages" while **not** "also call[ing] out the amount of potentially less desirable ingredients, like sugars, sweeteners, sodium or saturated

---

[65] *Id.*

[66] *Id.*

[67] Danley, Sam, "Study finds few consumers understand healthy food labels," *Supermarket Perimeter* (Mar. 16, 2022), *available at* https://www.supermarketperimeter.com/articles/7888-study-finds-few-consumers-understand-healthy-food-labels.

[68] Shaheen, nutrition label, *supra* n. 64.

[69] *Id.*

*Lee v. Nature's Path Foods, Inc.*
CLASS ACTION COMPLAINT

fats."[70] It "found that this kind of potentially selective attribute labeling . . . had the biggest sway in leading consumers to make incorrect health-related choices."[71]

70.  Additionally, reading the Products' nutrition information is unlikely to sufficiently correct consumers' understanding of the healthfulness of the Products because the vast majority of consumers do not have the nutrition knowledge to accurately interpret the nutrition facts. In other words, "frequent use of nutrition labels does not promote understanding of [nutrient] levels."[72]

71.  A 2017 Shopper Trends Study by Label Insights found that "67% of consumers say it is challenging to determine whether a food product meets their [dietary] needs simply by looking at the package label[.]"[73]

72.  A 2021 survey found that "[c]onsumers perceive health differences even when two products have the same Nutrition Facts label" if there are packaging claims suggesting healthfulness.[74]

73.  In one survey, more than 3,000 U.S. adults viewed an ice cream nutrition label and then answered four questions that tested their ability to apply, understand, and interpret

---

[70] Poinski, Megan, "Fewer than 1 in 10 consumers can make healthy choices from front-of-pack labeling, study finds," *Food Dive* (Mar. 15, 2022), *available at* https://www.fooddive.com/news/fewer-than-1-in-10-consumers-can-make-healthy-choices-from-front-of-pack-la/620293/.

[71] *Id.*

[72] Soederberg et al., "The Effects of Nutrition Knowledge on Food Label Use: A Review of the Literature," *Appetite* (2015) (citing Howlett et al., "How modification of the nutrition facts panel influences consumers at risk for heart disease: The case of trans fat," *J. Pub. Pol. & Market.* (2008)).

[73] "Study Shows Labeling Often Confuses Consumers," *Packaging Strategies* (Mar. 30, 2017) *available at* https://www.packagingstrategies.com/articles/94081-study-shows-labeling-often-confuses-consumers (citing Label Insight 2017 Shopper Trends Study).

[74] International Food Information Council, "2021 Food & Health Survey," at 31 (2021), *available at* https://foodinsight.org/wp-content/uploads/2021/05/IFIC-2021-Food-and-Health-Survey.May-2021-1.pdf.

*Lee v. Nature's Path Foods, Inc.*
CLASS ACTION COMPLAINT

the nutrition information. Approximately 24% could not determine the calorie content of the full ice-cream container; 21% could not estimate the number of servings equal to 60g of carbohydrates; 42% could not estimate the effect on daily calorie intake of foregoing 1 serving; and 41% could not calculate the percentage daily value of calories in a single serving.[75] Only 53.9% of respondents who had earned a 4-year college degree could correctly answer all four nutrition label questions.[76]

74.    Recently, the FDA recognized that "many consumers would like to know how to use th[e] [Nutrition Facts] information more effectively and easily," and so published a guide on "How to Understand and Use the Nutrition Facts Label."[77] It took the FDA nearly twelve pages to explain how to "make it easier for you to use the Nutrition Facts labels to make quick, informed food decisions to help you choose a healthy diet."

75.    The problem is so severe, the FDA created an entire "education campaign" designed to "help consumers, health care professionals, and educators learn how to use [the Nutrition Facts Label] as a tool for maintaining healthy dietary practice," recognizing the current widespread confusion, even among "health care professionals," in how to properly use the Nutrition Facts to make healthy choices.[78]

**C.    Nature's Path Deceptively Omits Material Information**

76.    While representing that the Products are healthy, Nature's Path regularly and intentionally omits material information regarding the countervailing detrimental effects of the added sugars in the Products on bodily health.

---

[75] Persoskie, US Consumers' Understanding, *supra* n.62.

[76] *Id*.

[77] FDA, "How to Understand and Use the Nutrition Facts Label," (last updated Feb. 25, 2022) *available at* https://www.fda.gov/food/new-nutrition-facts-label/how-understand-and-use-nutrition-facts-label#top.

[78] *See* FDA, "The New Nutrition Facts Label—What's in it for you?" (last updated Apr. 13, 2022) *available at* https://www.fda.gov/food/nutrition-education-resources-materials/new-nutrition-facts-label.

77. Nature's Path is under a duty to disclose this information to consumers because it is revealing some information about the Products—enough to suggest they are healthy—without revealing material information regarding the harmful effects of added sugar described herein.

78. Nature's Path is further under a duty to disclose this information because its deceptive omissions concern human health and safety, specifically the detrimental health consequences of consuming the Products.

79. Nature's Path is further under a duty to disclose this information because it was in a superior position to know of the dangers presented by the added sugars in the Products, as it is a large, sophisticated company that holds itself out as have expert knowledge regarding the health impact of consuming the Products.

80. Moreover, Nature's Path is under a duty to disclose this information because, including through the acts alleged herein, it actively concealed material facts not known to Plaintiff and the Class concerning the detrimental effects of regularly consuming the Products.

## IV. THE PRODUCTS' LABELING VIOLATES STATE AND FEDERAL REGULATIONS

81. The Products and their challenged labeling statements violate California Health and Safety Code §§ 109875, *et. seq.* (the "Sherman Law"), which has expressly adopted the federal food labeling requirements as its own. *See*, *e.g.*, *id.* § 110100; *id.* § 110670 ("Any food is misbranded if its labeling does not conform with the requirements for nutrition labeling as set forth in Section 403(r) (21 U.S.C. Sec. 343(r)) of the federal act and the regulation adopted pursuant thereto.").

82. First, the challenged claims are false and misleading for the reasons described herein, in violation of 21 U.S.C. § 343(a), which deems misbranded any food whose "label is false or misleading in any particular." Nature's Path accordingly also violated California's parallel provision of the Sherman Law. *See* Cal. Health & Safety Code § 110670.

83.     Second, despite making the challenged claims, Nature's Path "fail[ed] to reveal facts that are material in light of other representations made or suggested by the statement[s], word[s], design[s], device[s], or any combination thereof," in violation of 21 C.F.R. § 1.21(a)(1). Such facts include the detrimental health consequences of consuming the Products.

84.     Third, Nature's Path failed to reveal facts that were "[m]aterial with respect to the consequences which may result from use of the article under" both "[t]he conditions prescribed in such labeling," and "such conditions of use as are customary or usual," in violation of § 1.21(a)(2). Namely, Nature's Path failed to disclose the increased risk of serious chronic disease and death that is likely to result from the usual consumption of the Products in the customary and prescribed manners, including based on the tendency of consumers to eat more than one serving in a sitting.

85.     Fourth, the Products are misbranded (and also misleading), because the labels claim that the Products are healthy based on their nutrient content, but the Products do not meet the requirements for making such implied nutrient content claims as set forth in 21 C.F.R. § 101.65(d) because they exceed the limits on total and saturated fat.

86.     Specifically, on the Products' labeling, Nature's Path claims that the Products will "put you on a better path to a healthier lifestyle." These statements are made in association with the nutrient content claims regarding fiber and fatty acids.

87.     To "use the term 'healthy' or related terms (e.g., 'health,' 'healthful,' 'healthfully,' 'healthfulness,' 'healthier,' 'healthiest,' 'healthily,' and 'healthiness')" as an implied nutrient content claim, a food must satisfy specific "conditions for fat, saturated fat, cholesterol, and other nutrients." 21 C.F.R § 101.65(d)(2).

88.     The Products are "not specifically listed" in the table contained in 21 C.F.R § 101.65(d)(2)(i), and therefore are governed by section (F) of the table. *See* 101.65(d)(2)(i)(F).

89.     Under 21 C.F.R. § 101.65(d)(2)(i)(F), to use a "healthy" term, a food must, *inter alia*, (1) be "Low fat as defined in § 101.62(b)(2)," and (2) be "Low saturated fat as defined in § 101.62(c)(2)."

90.     Section 101.62(b)(2)(i)(A) provides the applicable definition of "low fat" for the Products because they have RACCs (reference amounts customarily consumed) and labeled servings of greater than 30 grams. Under this section, a food is low fat if it contains 3 grams or less of total fat.

91.     The Products contain between 9 and 11 grams of total fat per serving and thus violate the limit on total fat. As a result, their use of a "healthy" term renders the Products misbranded.

92.     Under section 101.62(c)(2), a food is "low saturated fat" only if it "contains 1 g or less of saturated fatty acids per reference amount customarily consumed and not more than 15 percent of calories from saturated fatty acids."

93.     The Products all contain 1.5 to 4 grams of saturated fat per serving. The Products therefore do not meet the saturated fat requirement in section 101.65(d)(2)(i)(F), and as a result, their use of a "healthy" term renders the Products misbranded.

## V.     PLAINTIFF'S PURCHASE, RELIANCE, AND INJURY

94.     Plaintiff Rebecca Lee purchased Nature's Path Granola, usually in the "Pumpkin Seed & Flax" flavor, several times over the course of a few months starting in January 2020. She typically purchased the Granola from Walmart and Vons stores in San Diego, California.

95.     When purchasing the Nature's Path Granola, Ms. Lee was seeking a nutritious, healthy food, that is, the type of food whose regular consumption would not likely increase the risk of disease. In purchasing the Nature's Path Granola, Ms. Lee was exposed to, read, and relied on Nature's Path's health and wellness representations described herein, including that consuming the Product is a "wholesome breakfast to nourish your day," and "it'll put you on a better path to a healthier lifestyle."

96.     These claims, however, were and are deceptive because the Products are not healthy, but instead contain such high levels of added sugar that their regular consumption contributes to an increased risk of disease.

97.     Ms. Lee is not a nutritionist, food expert, or food scientist, but rather a lay consumer, like other average consumers, who did not have the specialized knowledge that

*Lee v. Nature's Path Foods, Inc.*
CLASS ACTION COMPLAINT

Nature's Path had regarding the nutritional composition of the Nature's Path Granola. At the time of purchase, Ms. Lee was unaware of the extent to which consuming high amounts of added sugar adversely affects health or what amount of added sugar might have such an effect.

98.    Ms. Lee acted reasonably in relying on the challenged labeling claims, which Nature's Path intentionally placed on the Products' labeling with the intent to induce average consumers into purchasing the Products.

99.    Ms. Lee would not have purchased the Nature's Path Granola if she knew that the challenged labeling claims were false and misleading in that the Nature's Path Granola does not provide the health benefits promised, and is detrimental rather than beneficial to health.

100.    The Products cost more than similar products without misleading labeling and would have cost less absent Nature's Path's false and misleading statements and omissions.

101.    Through the misleading labeling claims and omissions, Nature's Path was able to gain a greater share of the market than it would have otherwise and was able to increase the size of the market.

102.    Ms. Lee paid more for the Nature's Path Granola, and would only have been willing to pay less, or unwilling to purchase it at all, absent the false and misleading labeling complained of herein.

103.    Ms. Lee would not have purchased the Nature's Path Granola if she had known it was misbranded pursuant to California and FDA regulations, or that the challenged claims were false or misleading.

104.    For these reasons, the Products were worth less than what Ms. Lee and the Class paid for them.

105.    Instead of receiving products that had actual healthful qualities, the Products Ms. Lee and the Class received were likely to lead to increased risk of disease when consumed regularly.

*Lee v. Nature's Path Foods, Inc.*
CLASS ACTION COMPLAINT

106.   Ms. Lee and the Class lost money as a result of Nature's Path's deceptive claims, omissions, and practices in that they did not receive what they paid for when purchasing the Products.

107.   Ms. Lee still wishes to purchase healthy foods with nutritional benefits and continues to see the Products at stores when she shops. She would purchase the Products in the future if they were healthy as represented, but unless Nature's Path is enjoined in the manner Ms. Lee seeks, she may not be able to rely on Nature's Path's health and wellness claims in the future.

108.   Ms. Lee's substantive right to a marketplace free of fraud, where she is entitled to rely with confidence on representations such as those made by Nature's Path, continues to be violated every time Ms. Lee is exposed to the misleading labeling claims.

109.   Ms. Lee's legal remedies are inadequate to prevent these future injuries.

## CLASS ACTION ALLEGATIONS

110.   While reserving the right to redefine or amend the class definition prior to or as part of a motion seeking class certification, pursuant to Federal Rule of Civil Procedure 23, Plaintiff seeks to represent a class of all persons the in United States, and separately a Subclass of all persons in California, who, at any time from March 22, 2019[79] to the time a class is notified (the "Class Period"), purchased, for personal or household use, and not for resale or distribution, any of the Nature's Path Granola (the "Class" and "California Subclass," which is subsumed and included therein).

111.   The members in the proposed Class are so numerous that individual joinder of all members is impracticable, and the disposition of the claims of all Class Members in a single action will provide substantial benefits to the parties and Court.

112.   Questions of law and fact common to Plaintiff and the Class include:

113.   whether Nature's Path communicated a message regarding the healthfulness of the Products through their packaging and advertising;

---

[79] As of March 22, 2023, the parties agreed to toll applicable statutes of limitations.

a.     whether that message was material, or likely to be material, to a reasonable consumer;

b.     whether the challenged claims are false, misleading, or reasonably likely to deceive a reasonable consumer;

c.     whether Nature's Path's conduct is unfair or violates public policy;

d.     whether Nature's Path's conduct violates state or federal food statutes or regulations;

e.     whether Nature's Path made and breached warranties

f.     the proper amount of damages, including punitive damages;

g.     the proper amount of restitution;

h.     the proper scope of injunctive relief; and

i.     the proper amount of attorneys' fees.

114.   These common questions of law and fact predominate over questions that affect only individual Class Members.

115.   Plaintiff's claims are typical of Class Members' claims because they are based on the same underlying facts, events, and circumstances relating to Nature's Path's conduct. Specifically, all Class Members, including Plaintiff, were subjected to the same misleading and deceptive conduct when they purchased the Products and suffered economic injury because the Products are misrepresented. Absent Nature's Path's business practice of deceptively and unlawfully labeling the Products, Plaintiff and other Class Members would not have purchased them or would have paid less for them.

116.   Plaintiff will fairly and adequately represent and protect the interests of the Class, has no interests incompatible with the interests of the Class, and has retained counsel competent and experienced in class action litigation, and specifically in litigation involving the false and misleading advertising of foods and beverages.

117.   Class treatment is superior to other options for resolution of the controversy because the relief sought for each Class Member is small, such that, absent representative litigation, it would be infeasible for Class Members to redress the wrongs done to them.

118.   Nature's Path has acted on grounds applicable to the Class, thereby making appropriate final injunctive and declaratory relief concerning the Class as a whole.

119.   As a result of the foregoing, class treatment is appropriate under Fed. R. Civ. P. 23(a), 23(b)(2), and 23(b)(3).

## CAUSES OF ACTION

## FIRST CAUSE OF ACTION

**Violations of the Unfair Competition Law, Cal. Bus. & Prof. Code §§ 17200 *et seq.***

120.   Plaintiff realleges and incorporates the allegations elsewhere in the Complaint as if set forth fully herein.

121.   The UCL prohibits any "unlawful, unfair or fraudulent business act or practice." Cal. Bus. & Prof. Code § 17200.

122.   The acts, omissions, misrepresentations, practices, and non-disclosures of as alleged herein constitute business acts and practices.

## Fraudulent

123.   A statement or practice is fraudulent under the UCL if it is likely to deceive a significant portion of the public, applying an objective reasonable consumer test.

124.   As set forth herein, the challenged labeling claims and omissions relating to the Products are likely to deceive reasonable consumers and the public.

## Unlawful

125.   The acts alleged herein are "unlawful" under the UCL in that they violate at least the following laws:

> •      The False Advertising Law, Cal. Bus. & Prof. Code §§ 17500 *et seq.*;
>
> •      The Consumers Legal Remedies Act, Cal. Civ. Code §§ 1750 *et seq.*;
>
> •      The Federal Food, Drug, and Cosmetic Act, 21 U.S.C. §§ 301 *et seq.*; and
>
> •      The California Sherman Food, Drug, and Cosmetic Law, Cal. Health & Safety Code §§ 110100 *et seq.*

## Unfair

126. Nature's Path's conduct with respect to the labeling, advertising, and sale of the Products was unfair because Nature's Path's conduct was immoral, unethical, unscrupulous, or substantially injurious to consumers, and the utility of its conduct, if any, does not outweigh the gravity of the harm to its victims.

127. Nature's Path's conduct with respect to the labeling, advertising, and sale of the Products was and is also unfair because it violates public policy as declared by specific constitutional, statutory or regulatory provisions, including but not necessarily limited to the False Advertising Law, portions of the Federal Food, Drug, and Cosmetic Act, and portions of the California Sherman Food, Drug, and Cosmetic Law.

128. Nature's Path's conduct with respect to the labeling, advertising, and sale of the Products was and is also unfair because the consumer injury was substantial, not outweighed by benefits to consumers or competition, and not one that consumers themselves could reasonably have avoided. Specifically, the increase in profits obtained by Nature's Path through the misleading labeling does not outweigh the harm to Class Members who were deceived into purchasing the Products, believing they were healthy, when in fact they are the types of food likely to detriment health.

129. Nature's Path profited from the sale of the falsely, deceptively, and unlawfully advertised the Products to unwary consumers.

130. Plaintiff and Class Members are likely to continue to be damaged by Nature's Path's deceptive trade practices, because Nature's Path continues to disseminate misleading information. Thus, injunctive relief enjoining Nature's Path's deceptive practices is proper.

131. Nature's Path's conduct caused and continues to cause substantial injury to Plaintiff and other Class Members. Plaintiff has suffered injury in fact as a result of Nature's Path's unlawful conduct.

132. In accordance with Bus. & Prof. Code § 17203, Plaintiff seeks an order enjoining Nature's Path from continuing to conduct business through unlawful, unfair, and/or fraudulent acts and practices, and to commence a corrective advertising campaign.

133.   Plaintiff and the Class also seek an order for the restitution of all monies from the sale of the Nature's Path Products, which were unjustly acquired through acts of unlawful competition.

134.   Because Plaintiff's claims under the "unfair" prong of the UCL sweep more broadly than her claims under the FAL, CLRA, or UCL's "fraudulent" prong, Plaintiff's legal remedies are inadequate to fully compensate Plaintiff for all of Nature's Path's challenged behavior.

**SECOND CAUSE OF ACTION**

**Violations of the False Advertising Law, Cal. Bus. & Prof. Code §§ 17500 *et seq.***

135.   Plaintiff realleges and incorporates the allegations elsewhere in the Complaint as if set forth fully herein.

136.   The FAL provides that "[i]t is unlawful for any person, firm, corporation or association, or any employee thereof with intent directly or indirectly to dispose of real or personal property or to perform services" to disseminate any statement "which is untrue or misleading, and which is known, or which by the exercise of reasonable care should be known, to be untrue or misleading." Cal. Bus. & Prof. Code § 17500.

137.   It is also unlawful under the FAL to disseminate statements concerning property or services that are "untrue or misleading, and which is known, or which by the exercise of reasonable care should be known, to be untrue or misleading." *Id*.

138.   As alleged herein, the advertisements, labeling, policies, acts, and practices of Nature's Path relating to the Products were likely to mislead consumers acting reasonably, as to the healthfulness of the products.

139.   Plaintiff suffered injury in fact as a result of Nature's Path's actions as set forth herein because Plaintiff purchased the Products in reliance on Nature's Path's false and misleading marketing claims and omissions stating or suggesting that the Products are healthful and nutritious.

140.   Nature's Path's business practices as alleged herein constitute unfair, deceptive, untrue, and misleading advertising pursuant to the FAL because Nature's Path has advertised

the Products in a manner that is untrue and misleading, which Nature's Path knew or reasonably should have known, and omitted material information from the Products' labeling.

141.    Nature's Path profited from the sale of the falsely and deceptively advertised the Products to unwary consumers.

142.    As a result, Plaintiff, the Class, and the general public are entitled to injunctive and equitable relief, restitution, and an order for the disgorgement of the funds by which Nature's Path was unjustly enriched.

143.    Pursuant to Cal. Bus. & Prof. Code § 17535, Plaintiff, on behalf of herself and the Class, seek an order enjoining Nature's Path from continuing to engage in deceptive business practices, false advertising, and any other act prohibited by law, including those set forth in this Complaint.

144.    Because the Court has broad discretion to award restitution under the FAL and could, when assessing restitution under the FAL, apply a standard different than that applied to assessing damages under the CLRA or commercial code (for Plaintiff's breach of warranty claims), and restitution is not limited to returning to Plaintiff and class members monies in which they have an interest, but more broadly serves to deter the offender and others from future violations, the legal remedies available under the CLRA and commercial code are more limited than the equitable remedies available under the FAL, and are therefore inadequate.

### THIRD CAUSE OF ACTION

**Violations of the Consumers Legal Remedies Act, Cal. Civ. Code §§ 1750 *et seq.***

145.    Plaintiff realleges and incorporates the allegations elsewhere in the Complaint as if set forth fully herein.

146.    The CLRA prohibits deceptive practices in connection with the conduct of a business that provides goods, property, or services primarily for personal, family, or household purposes.

147.    Nature's Path's false and misleading labeling and other policies, acts, and practices were designed to, and did, induce the purchase and use of the Products for personal,

family, or household purposes by Plaintiff and Class Members, and violated and continue to violate the following sections of the CLRA:

148.   § 1770(a)(5): representing that goods have characteristics, uses, or benefits which they do not have;

     a.   § 1770(a)(7): representing that goods are of a particular standard, quality, or grade if they are of another;

     b.   § 1770(a)(9): advertising goods with intent not to sell them as advertised; and

     c.   § 1770(a)(16): representing the subject of a transaction has been supplied in accordance with a previous representation when it has not.

149.   Nature's Path profited from the sale of the falsely, deceptively, and unlawfully advertised the Products to unwary consumers.

150.   Nature's Path's wrongful business practices constituted, and constitute, a continuing course of conduct in violation of the CLRA.

151.   Pursuant to California Civil Code § 1782, more than 30 days before filing this lawsuit, Plaintiff sent to Nature's Path by certified mail, return receipt requested, written notice of her claims and Nature's Path's particular violations of the Act, but Nature's Path has failed to implement remedial measures.

152.   As a result, Plaintiff and the Class have suffered harm, and therefore seek actual damages resulting from purchases of the Products sold throughout the Class Period to all Class Members, punitive damages, injunctive relief in the form of modified advertising and a corrective advertising plan, restitution, and attorneys' fees and costs. *See* Cal. Civ. Code § 1782(d).

153.   In compliance with Cal. Civ. Code § 1780(d), an affidavit of venue is filed concurrently herewith.

**FOURTH CAUSE OF ACTION**

**Breaches of Express Warranties, Cal. Com. Code § 2313(1)**

154.   Plaintiff realleges and incorporates the allegations elsewhere in the Complaint as if set forth fully herein.

155.   Through the Products' labeling, Nature's Path made affirmations of fact or promises, or description of goods, that, *inter alia*, the products are beneficial to health and provide health benefits. These affirmations and descriptions include "wholesome breakfast to nourish your day," and "[it']ll put you on a better path to a healthier lifestyle."

156.   These representations were part of the basis of the bargain in that Plaintiff and the Class purchased the Products in reasonable reliance on those statements. Cal. Com. Code § 2313(1).

157.   Nature's Path breached its express warranties by selling Products that, for the reasons described herein, do not meet the above affirmations, promises, and product descriptions.

158.   That breach actually and proximately caused injury in the form of the lost purchase price that Plaintiff and Class Members paid for the Products.

159.   As a result, Plaintiff seeks on behalf of herself and other Class Members, actual damages arising as a result of Nature's Path's breaches of express warranties, including, without limitation, expectation damages.

**FIFTH CAUSE OF ACTION**

**Breach of Implied Warranty of Merchantability, Cal. Com. Code § 2314**

160.   Plaintiff realleges and incorporates the allegations elsewhere in the Complaint as if set forth fully herein.

161.   Nature's Path, through its acts set forth herein, in the sale, marketing, and promotion of the Products bearing the statements "wholesome breakfast to nourish your day" and "[it']ll put you on a better path to a healthier lifestyle," made representations, that, *inter alia*, the Products are healthy.

162.   Nature's Path is a merchant with respect to the goods of this kind which were sold to Plaintiff and the Class, and there were, in the sale to Plaintiff and the Class, implied warranties that those goods were merchantable.

163.   Nature's Path breached that implied warranty because, for the reasons discussed herein, the Products were and are not wholesome, nourishing, and healthy.

164.   As an actual and proximate result of Nature's Path's conduct, Plaintiff and the Class did not receive goods as impliedly warranted by Nature's Path to be merchantable in that they did not conform to promises and affirmations made on the container or label of the goods.

165.   As a result, Plaintiff seeks actual damages, including, without limitation, expectation damages.

## SIXTH CAUSE OF ACTION
### Negligent Misrepresentation

166.   Plaintiff realleges and incorporates the allegations elsewhere in the Complaint as if fully set forth herein.

167.   As alleged above, Defendant misrepresented the healthfulness of its Products and omitted that consuming the Products increases the risk of metabolic disease, cardiovascular disease, type 2 diabetes, and liver disease, and is further associated with increased all-cause mortality. These misrepresentations and omissions constituted a material fact in that a consumer's decision to purchase the Products would be influenced by the healthfulness of the Products.

168.   Defendant's misrepresentations and omissions were made in the course of business transactions (the marketing, advertisement, sale, and purchase of the Products) in which both Plaintiff and Defendant have a pecuniary interest.

169.   Defendant knew or should have known that these representations and omissions were false or misleading and it failed to exercise reasonable care in dissemination of its labels and in its marketing and advertising.

170.   Defendant possesses superior knowledge regarding the detrimental health effects of consuming the Products. Such knowledge is not readily available to consumers like Plaintiff and Class Members.

171.   Defendant has a duty to provide consumers, like Plaintiff and Class Members, not to provide them with false information when they were making their purchasing decisions regarding the Products.

172.   Defendant holds itself out as an expert in nutrition and health science.

173.   Consumers lack nutritional science expertise that Defendant possesses, and therefore when Defendant makes representations as the healthfulness of its Products on its labels, consumers rely on Defendant to provide truthful and complete information.

174.   Defendant knew or should have known that Plaintiff and other consumers rely on its labeling and health representations and its representations and omissions to induce consumers like Plaintiff and Class Members into purchasing the Products.

175.   Plaintiff's injuries were proximately caused by Defendant's misrepresentations and omissions. Plaintiff viewed Defendant's labels prior to purchasing the Products, and the representations and omissions prompted him to purchase the Products. Had Plaintiff been aware of Defendant's misrepresentations and omissions, she would have been unwilling to purchase the Products, or to purchase them at the price that she paid.

176.   Defendant's misrepresentations regarding the Products are material to a reasonable consumer because they relate to bodily health, and reasonable consumers would attach importance to such representations and omissions which would influence their purchasing decision.

177.   In selling the Products, Defendant acted in the ordinary course of its business and had a pecuniary interest in Plaintiff and Class Members purchasing the Products.

178.    Defendant owed a duty of care to Plaintiff, not to provide her false or incomplete information when she was making her purchase decisions regarding the Products.

179. Plaintiff and Class Members have reasonably and justifiably relied on Defendant's misrepresentations when purchasing the Products, and had the correct facts been known, would not have purchased them or at least not at the prices at which they were offered.

180. Therefore, as a direct and proximate result of Defendant's negligent misrepresentations, Plaintiff and Class Members have suffered economic losses and other general and specific damages, in the amount of the Products' purchase price, or some portion thereof, and any interest that would have accrued on those monies, all in an amount to be proven at trial.

**SEVENTH CAUSE OF ACTION**

**Intentional Misrepresentation**

181. Plaintiff realleges and incorporates the allegations elsewhere in the Complaint as if set forth in full herein.

182. Defendant marketed the Products in a manner conveying to reasonable consumers that the Products are healthy. Therefore, Defendant has made misrepresentations about the healthfulness of the Products.

183. Defendant's misrepresentations regarding the Products are material to a reasonable consumer because they relate to bodily health. A reasonable consumer would attach importance to such representations and would be induced to act thereon in making purchasing decisions.

184. At all relevant times, Defendant knew that the misrepresentations were misleading, or has acted recklessly in making the misrepresentations, without regard to their truth.

185. Defendant intended that Plaintiff and other consumers rely on these misrepresentations on the Products' packaging.

186. Plaintiff and the Class have reasonably and justifiably relied on Defendant's intentional misrepresentations when purchasing the Products; had the correct facts been known, they would not have purchased the Products, or at least not at the prices at which the Products were offered.

187. Therefore, as a direct and proximate result of Defendant's intentional misrepresentations, Plaintiff and Class Members have suffered economic losses and other general and specific damages, in the amount of the Products' purchase price, or some portion thereof, and any interest that would have accrued on those monies, all in an amount to be proven at trial.

## EIGHTH CAUSE OF ACTION

### Unjust Enrichment

188. Plaintiff realleges and incorporates the allegations elsewhere in the Complaint as if fully set forth herein.

189. Plaintiff and Class Members conferred upon Defendant an economic benefit, in the form of profits resulting from the purchase and sale of the Products.

190. Defendant's financial benefits resulting from its unlawful and inequitable conduct are economically traceable to Plaintiff's and Class Members' purchases of the Products, and the economic benefits conferred on Defendant are a direct and proximate result of its unlawful and inequitable conduct.

191. It would be inequitable, unconscionable, and unjust for Defendant to be permitted to retain these economic benefits because the benefits were procured as a direct and proximate result of its wrongful conduct.

192. As a result, Plaintiff and Class Members are entitled to equitable relief including restitution and/or disgorgement of all revenues, earnings, profits, compensation and benefits which may have been obtained by Defendant as a result of such business practices.

## PRAYER FOR RELIEF

193. Wherefore, Plaintiff, on behalf of herself, all others similarly situated, and the general public, prays for judgment against Nature's Path as to each and every cause of action, and the following remedies:

194. An Order declaring this action to be a proper class action, appointing Plaintiff as Class Representative, and appointing Plaintiff's undersigned counsel as Class Counsel;

    a. An Order requiring Nature's Path to bear the cost of Class Notice;

b.    An Order compelling Nature's Path to conduct a corrective advertising campaign;

c.    An Order compelling Nature's Path to destroy all misleading and deceptive advertising materials and product labels, and to recall all offending products;

d.    An Order requiring Nature's Path to disgorge all monies, revenues, and profits obtained by means of any wrongful act or practice;

e.    An Order requiring Nature's Path to pay restitution to restore all funds acquired by means of any act or practice declared by this Court to be an unlawful, unfair, or fraudulent business act or practice, or untrue or misleading advertising, plus pre-and post-judgment interest thereon;

f.    An Order requiring Nature's Path to pay compensatory damages and punitive damages as permitted by law;

g.    An award of attorneys' fees and costs; and

h.    Any other and further relief that Court deems necessary, just, or proper.

## **JURY DEMAND**

195.   Plaintiff hereby demands a trial by jury on all issues so triable.

Dated: April 24, 2023          /s/ Paul K. Joseph

**FITZGERALD JOSEPH LLP**
JACK FITZGERALD
*jack@fitzgeraldjoseph.com*
PAUL K. JOSEPH
*paul@fitzgeraldjoseph.com*
MELANIE PERSINGER
*melanie@fitzgeraldjoseph.com*
TREVOR M. FLYNN
*trevor@fitzgeraldjoseph.com*
CAROLINE S. EMHARDT
*caroline@fitzgeraldjoseph.com*
2341 Jefferson Street, Suite 200
San Diego, California 92110
Phone: (619) 215-1741

40

1

*Counsel for Plaintiff*

2

3

4

5

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

*Lee v. Nature's Path Foods, Inc.*
CLASS ACTION COMPLAINT